UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

| | |
|---|---|
| Hiteks Solutions, Inc., | Civil Action No: 1:25-cv-200 (JPO) |
| *Plaintiff*, | |
| — against — | **FIRST AMENDED COMPLAINT** |
| Citibank, N.A.; John Does 1-5; and ABC Corporations 1-5; | |
| | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

--------------------------------------------------------X

Plaintiff, Hiteks Solutions, Inc. ("Hiteks" or "Plaintiff"), by its attorneys Salzano Ettinger and Lampert LLP, and DeBenedictis & DeBenedictis LLC, alleges as follows:

## NATURE OF THE ACTION

1.      Hiteks is a health information technology ("IT") company that was founded in the State of New York in 2011. The company founder and Chief Executive Officer is Gerasimos Petratos.

2.      Mr. Petratos, on behalf of Hiteks, first opened a business account with Defendant Citibank, N.A. (together with ABC Corporations 1-5 and John Does 1-5 hereinafter referred to as "Defendant(s)" or "Citibank") on or about 2013, opened a second account on or about 2017. The current account was opened in November 2023, while under duress, at Citibank's behest, and as part of the fraud investigation and related re-securing process for the prior account.

3.      This account, as Mr. Petratos understood it, was essentially being opened to simply change the account numbers because the prior account had been compromised.

4.    Mr. Petratos is, and has been, the sole authorized user of Hiteks' accounts.

5.    On Friday, November 3, 2023, at approximately 3 p.m. ET, Mr. Petratos was in the New York office of Hiteks, and received a telephone call from someone who identified themselves as a representative from the Citibank Fraud Department.

6.    The call appeared authentic. The call also seems to indicate that Citibank's systems and/or internal personnel were involved.

7.    For example, the call was from an official Citibank 800 number listed on Citibank's website, not some random number.

8.    Specifically, the call came from Citibank's official customer service number and fraud reporting line, $800-285$-1709, a number also provided by Citibank for reporting fraud. *See, e.g.* Exhibit G hereto, Citibank's Fraud Awareness Bulletin instructing Customers to report issues to this line,[1].

9.    The call was received at the authorized phone number for Hiteks' Citibank business account as listed on Citibank's internal account records.

10.    The representative also knew that Mr. Petratos was the sole authorized user of the Hiteks account and that the contact was being made on the authorized phone number for the account, without prompting or disclosure by Mr. Petratos, information available on Citibank's internal account records.

---

[1] Exhibit G, also found at https://online.citi.com/JRS/popups/Fraud_Awarness.pdf and last accessed 2/25/25, directs customers to "*Contact your local police department immediately if you believe you have been a victim of fraud or have either received a call or responded to an email received from someone who you now believe was trying to perpetrate fraud. Citibank customers with questions about their accounts, including transactions on them, should call customer service at 1-800-285-1709, option 1. Representatives are available to assist you 7:00 AM $-$ 11:00 PM EST (Mon through Fri) and 9:00 AM $-$ 5:30 PM EST (Sat and Sun).*" (emphasis added). Reference to the number can be found on various locations on Citibank's official web pages and publications.

11.    Consistent with Citibank's procedures, the caller did not ask for any additional information.

12.    Rather, the caller stated that Citibank had detected fraud on the Hiteks account.

13.    The caller informed Mr. Petratos that there was a $600 charge at a Walmart in Texas that utilized the debit card associated with the Hiteks' account, and asked him if it was a valid charge. Mr. Petratos told the representative that it was not. Based thereon, the representative told Mr. Petratos that they were going to freeze the card and lock the Hiteks bank account for two business days, to conduct a security breach investigation. The representative further told Mr. Petratos to check back in three business days to receive an update on Citibank's activity.

14.    At no time did the representative ask Mr. Petratos for a password or other security information for the account.

15.    Nor did Mr. Petratos provide the representative with any security information or his account password.

16.    Hiteks does significant business overseas and utilizes wire transfers.

17.    Because of these banking particulars, security protocols were important to Hiteks when selecting its banking partner.

18.    Hiteks, by and through Mr. Petratos, specifically chose Citibank as the custodian for its business accounts at issue because of their advertised corporate security procedures and protocols, such as multi-factor authentication, including but not limited to using token generators to secure wire transfers and account login beyond the simple password and user name entry.

19.    Citibank represented and advertised that it required contemporaneous multi-factor authentication, and that contemporaneous multi-factor authentication security procedures were

employed for each wire transfer by requiring a passcode to be entered at the time the wire request was made.

20.     What Mr. Petratos did not know, but upon information and belief Citibank knew and the hackers exploited, was that Citibank had a massive security loophole.

21.     Specifically, for years prior to the fraud in Hiteks' account, Citibank provided a back door entry method that permitted the hackers to circumvent the business account security procedures and protocols.

22.     Upon information and belief, while token generators and multi-factor authentication would be required to send a wire from any business account logged into through Citibank's business portal (the "Front Door"), for years Citibank provided a massive, but undisclosed security loophole that left business account holder's money recklessly unsecured and subject theft via a back door login when accessed via the citi.com website (the "Back Door").

23.     Citibank knew that failure to provide multi-factor authentication for each wire transfer request was not a commercially reasonable product, but failed to take reasonable steps to safeguard business accounts from such access.

24.     Citibank knew, or should have known, that its banking systems contained substantial security gaps that put customer bank accounts at grave risk for exploitation by hackers.

25.     Essentially, for years scammers could access a business account from the non-business login page at citi.com.

26.     And, upon information and belief, if that entry method was used, the scammers could bypass crucial security protocols and send wires up to $50,000 a day by simply entering a username and password, and without having to enter a contemporaneously generated security code.

27.     Further, upon information and belief with respect to these fraudulent wire transfers at issue, Citibank's internal protocols requiring contemporaneous multi-factor authentication were somehow overridden and/or records altered to indicate that the wire had been multi-factor authenticated even in cases where it was not, indicating, inter alia, an intimate knowledge of Citibank's internal workings on behalf of the fraudsters.

28.     Immediately after receiving a phone call from whom he reasonably believed was a Citibank agent—and during the short period where Mr. Petratos believed that the Hiteks account was temporarily frozen for Citibank to investigate the alleged fraud—Citibank processed three unauthorized wire transfers from Hiteks's account WITHOUT using multi-factor authentication via a contemporaneously provided authentication code.

29.     Each of the three wire transfers was purportedly for the purchase and/or renovation of real estate in three different states, and the money was sent to three named individuals of whom Hiteks had never sent a wire before.

30.     In conjunction with each of the three wire transfers, Citibank did not attempt to send a security code sent to the official account phone number ending in x1507 via text or via a voice call from its auto-dialer, despite Citibank's apparent insistence on the opposite.

31.     The wire transfer special instructions for each request were sent in all capital letters, with several grammatical errors.

32.     For the first wire transfer, which Citibank received on Monday, November 6, 2023 and processed that same day at 10:08 AM, Citibank wired $49,995.00 to Ashani Lewis ("Lewis"), who maintains an account with Wells Fargo Bank, N.A. ("Wells Fargo"), and whose address is in Hartford, Connecticut. *See* Exhibit A, Citi Wire Transfer Details. The "special instructions" for the wire transfer have zero relation to Hiteks's business. Specifically, the special instructions read:

"NEED PAYMENT SENT URGENT BUSINESS DEAL CLOSING FOR RENOVATE AND REPAIRS." As is evident from even a cursory review of the wire transfer, the special instructions contain numerous grammatical errors. At no time has Hiteks ever used such language in a wire transfer request.

33.     For the second wire transfer, which Citibank received on Tuesday, November 7, 2023 and processed that same day at 6:01 AM, Citibank wired $50,000.00 to Juliet Mendez ("Mendez"), who maintains an account with TD Bank, N.A. ("TD Bank"), and whose address is in Philadelphia, Pennsylvania. *See* Exhibit A, Citi Wire Transfer Details. The "special instructions" for the wire transfer have zero relation to Hiteks's business. Specifically, the special instructions read: "NEED PAYMENT SENT EXPEDITIOUSLY BUSINESS DEAL CLOSING TO RENOVATE."

34.     For the third wire transfer, which Citibank received on Wednesday, November 8, 2023 and processed that same day at 6:01 AM, Citibank wired $49,999.89 to Lourdes Thalice Leon Fundora ("Fundora"), who maintains an account with Wells Fargo, and whose address is in Miami, Florida. *See* Exhibit A, Citi Wire Transfer Details. The "special instructions" for the wire transfer have zero relation to Hiteks's business. Specifically, the special instructions read: "NEED PAYMENT SENT EXPEDITIOUSLY FINALIZATION OF BUSINESS DEAL RENOVATIONS COMPLETED."

35.     On November 8, 2023, Mr. Petratos attempted to access the Hiteks Citibank account only to realize that he was still locked out of the account.

36.     He then contacted Citibank, and was connected with the Citibank Fraud Department. The Citibank representative told Mr. Petratos that, over the past three days, $149,994.89 was fraudulently wired to three individuals. The representative told Mr. Petratos to

visit a Citibank branch and complete a fraudulent transaction form, and that the money would be credited bank to the Hiteks account. The Citibank representative also told Mr. Petratos that the third wire transfer, to Fundora, had not yet been finalized and that the representative would request that the wire transfer not be made. Despite these representations, Citibank failed to stop the third wire transfer from being sent from Hiteks's account.

37.     Mr. Petratos visited a Citibank branch in Manhattan, and spoke with a branch supervisor, Joshua A. Carire. Mr. Carire holds the titles of Citibank Assistant Vice President and Citibank Retail Business Banker; his NMLS# is 1639769.

38.     Mr. Carire told Mr. Petratos that he would need to notarize three affidavits that state he was not a party to the fraudulent transactions and that he did not authorize the fraudulent transactions. Mr. Petratos complied with this request. A copy of the notarized affidavits is attached hereto as Exhibit B.

39.     Mr. Carire then told Mr. Petratos that Citibank would credit the money back to the Hiteks account, but that it might take a few months. In the meantime, Mr. Carire indicated that Citibank would permanently freeze the Hiteks account and that Mr. Petratos would have to open a new Hiteks business account, which he did.

40.     Mr. Petratos also filed a complaint for stolen currency with the New York City Police Department. A copy of the police complaint is attached hereto as Exhibit C.

41.     In follow-up discussions, both in-person at Citibank branches in New York and over the telephone with the Citibank Fraud Department, Citibank representatives repeatedly and consistently reassured Mr. Petratos that the money would be credited back to Hiteks. At no time did a Citibank representative say that there was a chance that the money would not be credited back to the Hiteks account.

42.    Mr. Petratos kept in constant contact with Citibank regarding the refund, and repeatedly informed Citibank representatives that Hiteks was a small business and desperately needed that money to maintain payroll and for other business expenses.

43.    For weeks—and then months—Citibank kept stalling, and then, without providing any explanation or evidence, told Mr. Petratos that he was at fault for the fraudulent wire transfers and that Citibank would not credit the Hiteks account. *See* Citibank Denial Letter, attached hereto as Exhibit D.

44.    In turn, Hiteks was forced to obtain a short-term business loan to meet its payroll and business expenses. The short-term loan had an interest rate of 11.51%. For a loan of $199,000, Hiteks is obligated to repay, including interest, $258,700. A copy of the short-term loan is attached hereto as Exhibit E.

45.    None of the three aforementioned wire transfers was initiated by Hiteks or an authorized user of Hiteks's account.

46.    Each of the three aforementioned wire transfers was for business that bears no relation to Hiteks's business.

47.    For each of the three aforementioned wire transfers, Citibank failed to authenticate the transfer through commercially reasonable means, despite the fact that the fraudulent wire instructions specifically stated that the money was for business that bears no relation to Hiteks's business.

48.    Moreover, at no time did Citibank's fraud department recognize the fraudulent activity on Hiteks's account over the three-day period in November 2023.

49.    Defendant Citibank does not utilize commercially reasonable practices to detect fraud and prevent unauthorized wire transfers, nor does Citibank use commercially reasonable

practices to notify customers in the event of fraud or to secure its business accounts from unauthorized wire transfers by, *inter alia*, not requiring contemporaneous security code entry,

50.    Citibank failed to accept the aforementioned wire transfer requests in good faith, and failed to comply with commercially reasonable security procedures, as required under the Uniform Commercial Code (U.C.C.) § 4-A-202(2).

51.    Not using two-factor authentication is a commercially unreasonable security practice, known to Citibank.

52.    The transfer notices themselves should have put Citibank on notice that the requested wire transfers were not typical transactions of Hiteks.

53.    The transfer notices that Citibank processed used known fraudulent patterns of utilizing wire transfers of $50,000 or less.

54.    These and other gaps and unreasonable practices in Citibank fraud protection policies and practices are well-documented, both in congressional testimony held on February 2, 2024 before the U.S. Senate Committee on Banking, Housing, and Urban Affairs (a copy of which is attached hereto as Exhibit F), and in a lawsuit that was filed against Citibank on January 30, 2024 by the Attorney General of the State of New York, a copy of which is attached hereto as Exhibit G.

55.    For almost a year Plaintiff attempted to resolve the matter.

56.    For months, Plaintiff, individually and through its counsel, contacted Citibank on numerous occasions in an attempt to amicably settle this matter, but Citibank failed to respond to Plaintiff's inquiries despite months of emails, letters, and phone calls from Plaintiff and Plaintiff's counsel.

57.     Plaintiff is entitled to recoup consequential damages, litigation costs, and attorney fees because Citibank was grossly negligent and/or reckless in failing to properly authenticate the three fraudulent wire transfers.

58.     Specifically, Citibank did not utilize dual-factor authentication for the three fraudulent wire transfers.

59.     On the dates of the three fraudulent wire transfers, Plaintiff did not receive an authentication email, text message, or phone call from Citibank.

60.     Rather, Citibank processed the three fraudulent wire transfers without authenticating them, despite the fact that the wires were sent to individuals with whom Plaintiff had never conducted business, the wire memos indicated that the reason for the transfers had zero relationship to Plaintiff's business, the wire memos had numerous typos, and the wire memos utilized patterns that were known as fraudulent to those in the banking business.

61.     The fraudsters exploited gaps in Citibank's authentication policies and procedures, which were known or should have been known to Citibank.

62.     Plaintiff Hiteks brings this Amended Complaint against Defendant Citibank for violations of the U.C.C., conversion, fraud, and for violations of New York General Business Law Sections 349 and 350.

**JURISDICTION AND VENUE**

63.     Jurisdiction and venue are proper in New York County because: Plaintiff Hiteks maintains an office in this district and opened a Citibank account in this District; Defendant Citibank owns, uses, or possesses property within New York County; the causes of action herein arise from Defendant Citibank's contracting with New York County residents and New York businesses to supply goods and services in New York County; and/or Defendant Citibank has

committed tortious acts within and without New York County causing injury to persons or property within New York County. 28 U.S.C. § 1391; N.Y. C.P.L.R 301; N.Y. C.P.L.R 302; N.Y. C.P.L.R 503.

## THE PARTIES

64.     Hiteks Solutions Inc. is a Delaware corporation that maintains an address at 447 Broadway, 2nd Floor, New York, New York 10013.

65.     Defendant Citibank, N.A. is a national bank whose principal offerings include: investment banking, commercial banking, cash management, trade finance, and e-commerce; private banking products and services; consumer finance, credit cards, and mortgage lending; and retail banking and services. As of 2022, Citibank held more than $1 trillion in deposits, including more than $400 in consumer deposits. Defendant Citibank is headquartered at 5800 South Corporate Place, Sioux Falls, South Dakota 57108. Defendant Citibank is the wholly owned subsidiary of Citigroup, Inc., headquartered at 388 Greenwich Street, New York, New York 10013.

66.     John Does 1-5 are individuals, not currently known to Plaintiff, who were responsible, in whole or part, for the Citibank's decision to not use two factor authentication, implement the misleading disclosures regarding Citibank's security procedures, mislead account holders as to the adequacy of Citibank's security procedures, and/or are responsible in whole or in part for the harms suffered by Plaintiff.

67.     ABC Corporations 1-5 are corporate entities, affiliates, subsidiaries, and/or related entities to Citibank not currently known to Plaintiff, who were responsible, in whole or part, for the harms suffered by Plaintiff.

## ADDITIONAL FACTUAL ALLEGATIONS

**A.     Citibank Processes Three Fraudulent Wire Transfers and Then Promises to Credit the Money Back to Hiteks's Bank Account**

68.     Hiteks incorporates the proceeding paragraphs as if set forth herein.

69.     Hiteks is a health IT company that was founded in the State of New York in 2011. The company founder and Chief Executive Officer is Gerasimos Petratos. The company was incorporated in Delaware on or about 2017.

70.     Mr. Petratos, on behalf of Hiteks, opened a his original business checking account with Citibank on or about on or about 2013. Mr. Petratos is the sole authorized user of the account.

71.     On Friday, November 3, 2023, at approximately 3 p.m. ET, Mr. Petratos was in the New York office of Hiteks, and received a telephone call from someone who identified themselves as a representative from the Citibank Fraud Department. The representative contacted Mr. Petratos at the authorized phone number for Hiteks' Citibank account, and stated that Citibank had detected fraud on the Hiteks bank account. The representative knew that Mr. Petratos was the sole authorized user of the Hiteks account and knew the authorized phone number for the account. At no time did the representative ask Mr. Petratos for a password or other security information for the account. Nor did Mr. Petratos provide the representative with any security information or his account password.

72.     The representative told Mr. Petratos that there was a $600 charge at a Walmart in Texas that utilized the debit card associated with the Hiteks account, and asked him if it was a valid charge. Mr. Petratos told the representative that it was not a valid charge, and the representative told Mr. Petratos that they were going to freeze the card and lock the Hiteks bank account for two business days. The representative then told Mr. Petratos to check back in three business days to receive an update on the activity.

73.     Immediately thereafter, while Mr. Petratos believed that the Hiteks account was temporarily frozen for Citibank to investigate the alleged fraud, Citibank processed three

unauthorized wire transfers from Hiteks's account. Each of the three wire transfers was purportedly for the purchase and/or renovation of real estate in three different states, and the money was sent to three named individuals of whom Hiteks had never sent a wire before.

74.    For the first wire transfer, which Citibank received on Monday, November 6, 2023 and processed that same day at 10:08 AM, Citibank wired $49,995.00 to Ashani Lewis ("Lewis"), who maintains an account with Wells Fargo Bank, N.A. ("Wells Fargo"), and whose address is in Hartford, Connecticut. *See* Exhibit A, Citi Wire Transfer Details. The "special instructions" for the wire transfer have zero relation to Hiteks's business. Specifically, the special instructions read: "NEED PAYMENT SENT URGENT BUSINESS DEAL CLOSING FOR RENOVATE AND REPAIRS." As is evident from even a cursory review of the wire transfer, the special instructions contain numerous grammatical errors. Upon information and belief, Lewis maintains an address at 111 Woodlawn Circle East, Hartford, Connecticut 06108, and maintains an account with Wells Fargo.

75.    For the second wire transfer, which Citibank received on Tuesday, November 7, 2023 and processed that same day at 6:01 AM, Citibank wired $50,000.00 to Juliet Mendez ("Mendez"), who maintains an account with TD Bank, N.A. ("TD Bank"), and whose address is in Philadelphia, Pennsylvania. *See* Exhibit A, Citi Wire Transfer Details. The "special instructions" for the wire transfer have zero relation to Hiteks's business. Specifically, the special instructions read: "NEED PAYMENT SENT EXPEDITIOUSLY BUSINESS DEAL CLOSING TO RENOVATE." Upon information and belief, Mendez maintains an address at 4744 North Mascher Street, Philadelphia, Pennsylvania 19120, maintains an account with TD Bank.

76.    For the third wire transfer, which Citibank received on Wednesday, November 8, 2023 and processed that same day at 6:01 AM, Citibank wired $49,999.89 to Lourdes Thalice

Leon Fundora ("Fundora"), who maintains an account with Wells Fargo, and whose address is in Miami, Florida. *See* Exhibit A, Citi Wire Transfer Details. The "special instructions" for the wire transfer have zero relation to Hiteks's business. Specifically, the special instructions read: "NEED PAYMENT SENT EXPEDITIOUSLY FINALIZATION OF BUSINESS DEAL RENOVATIONS COMPLETED." Upon information and belief, Fundora maintains an address at 630 SW 62nd Avenue, Miami, Florida 33144, and maintains an account with Wells Fargo.

77.     On November 8, 2023, Mr. Petratos attempted to access the Hiteks Citibank bank account only to realize that he was still locked out of the account.

78.     He then contacted Citibank, and was connected with the Citibank Fraud Department. The Citibank representative told Mr. Petratos that, over the past three days, $149,994.89 was fraudulently wired to three individuals. The representative told Mr. Petratos to visit a Citibank branch and complete a fraudulent transaction form, and that the money would be credited bank to the Hiteks account. The Citibank representative also told Mr. Petratos that the third wire transfer, to Fundora, had not yet been finalized and that the representative would request that the wire transfer not be made. Despite these representations, Citibank failed to stop the third wire transfer from being sent from Hiteks's account.

79.     Mr. Petratos visited a Citibank branch in Manhattan, and spoke with a branch supervisor, Joshua A. Carire. Mr. Carire holds the titles of Citibank Assistant Vice President and Retail Business Banker. His NMLS# is 1639769.

80.     Mr. Carire told Mr. Petratos that he would need to notarize three affidavits that state he was not a party to the fraudulent transactions and that he did not authorize the fraudulent transactions. *See* Exhibit B.

81.    Mr. Carire then told Mr. Petratos that Citibank would credit the money back to the Hiteks account, but that it might take a few months. In the meantime, Mr. Carire indicated that Citibank would permanently freeze the Hiteks account and that Mr. Petratos would have to open a new Hiteks business account, which he did.

82.    Mr. Petratos also filed a complaint for stolen currency with the New York City Police Department. *See* Exhibit C.

83.    In follow-up discussions both in person at Citibank branches over the telephone with the Citibank Fraud Department, Citibank representatives repeatedly and consistently reassured Mr. Petratos that the money would be credited back to Hiteks. At no time did a Citibank representative say that there was a chance that the money would not be credited back to the Hiteks account.

84.    Mr. Petratos kept in constant contact with Citibank regarding the refund, and repeatedly informed Citibank representatives that Hiteks was a small business and desperately needed that money to maintain payroll and other business expenses.

85.    For weeks—and then months—Citibank kept stalling, and then told Mr. Petratos that he was at fault for the fraudulent wire transfers and that Citibank would not credit the Hiteks account. *See* Exhibit D.

86.    From the moment the fraud was reported by Hiteks to Citibank, and continuing up to the filing of the initial Complaint, Citibank has engaged in a bad faith investigation of this matter.

87.    As a result of the delay, Hiteks had to scramble to meet its payroll and business expenses on short notice or be in danger of running out of cash.

88.    To plug this hole, Hiteks had to sell off $258,700 in future revenue for $199,000, incurring additional costs of $59,700 as a result of the fraud.  *See* Exhibit E.

**B.**    **Citibank Failed to Accept the Wire Transfer Requests in Good Faith and Failed to Comply with Commercially Reasonable Security Procedures**

89.    None of the three aforementioned wire transfers was initiated by Hiteks or an authorized user of Hiteks's account.

90.    Each of the three aforementioned wire transfers was for business that bears no relation to Hiteks's business.

91.    For each of the three aforementioned wire transfers, Citibank failed to authenticate the transfer despite the fact that instructions specifically state that the money was for business that bears no relation to Hiteks's business.

92.    Moreover, at no time did Citibank's fraud department recognize the fraudulent activity on Hiteks's account over the three-day period in November 2023.

93.    Defendant Citibank does not utilize commercially reasonable practices to detect fraud and prevent unauthorized wire transfers.

94.    On the days that it sent the money from Hiteks's bank account, Citibank did not use multi-factor authentication for the three wire transfers. Specifically, Citibank did not authenticate the wire transfers with an email, phone call, or text message. These failures constitute gross negligence and/or reckless conduct on the part of Citibank.

95.    Citibank failed to accept the aforementioned wire transfer requests in good faith, and failed to comply with commercially reasonable security procedures, as required under U.C.C. § 4-A-202(2).

96.    The transfer notices themselves should have put Citibank on notice that the requested wire transfer was not a typical transaction of Hiteks.

97.    The transfer notices that Citibank processed used known fraudulent patterns of utilizing wire transfers of $50,000.00 or less.

98.    These and other gaps and unreasonable practices in Citibank fraud protection policies and practices are well-documented.

99.    A New York Attorney General investigation has revealed Citibank's widespread failure to use commercially reasonable security procedures.[2] *See* Exhibit G. As the complaint details: "Defendant Citi has not deployed sufficiently robust data security measures to protect consumer financial accounts, respond appropriately to red flags, or limit theft by scam. Instead, Citi has overpromised and underdelivered on security, reacted ineffectively to fraud alerts, misled consumers, and summarily denied their claims. Citi's illegal and deceptive practices have cost New Yorkers millions." *Id.* at p. 2.

100.    Citibank's unreasonable security precautions are caused, in part from the following: Citibank has connected wire transfer services to an account holder's online and mobile banking and has adopted unreasonable security measures to stop scammers from infiltrating the accounts and making unauthorized wire transfers. *See, e.g., id.*

101.    Citibank's unreasonable security measures include, but are not necessarily limited to, the following:

    a.    Citibank permits scammers to alter contact information, usernames, and passwords, upgrade accounts to access online wire transfer services, and consolidate funds across multiple accounts, all without subjecting to robust scrutiny scammers' subsequent requests to initiate large-dollar wire transfers

---

[2] The complaint also provides copious details on how wire transfers are implemented in the U.S. banking system, see Exhibit G at pp. 11-16, and how Citibank employs unreasonable security measures to stop scammers. *See* Exhibit G at pp. 25-28.

that will empty consumers' accounts;

    b.  Citibank fails to employ tools that effectively monitor and respond to anomalous consumer or account activity, such as wire transfers that are the first ever involving consumers' accounts, that are for out-of-the-ordinary amounts based on past activity, or that will effectively empty consumers' accounts; and

    c.  Even when alerted to fraudulent activity, Citibank does not effectively secure consumers' bank accounts, which remain vulnerable to scammers.

*See, e.g., id.* at p. 4.

102.    Citibank has failed to develop, implement, and maintain reasonable safeguards to protect the security, confidentiality, and integrity of Hiteks's financial account information.

103.    Citibank has failed to maintain a data security program that is appropriately designed to detect, prevent, and mitigate identify theft in response to red flags indicative of possible identity theft.

104.    The U.C.C. generally provides that banks must reimburse customers for unauthorized Payment Orders. U.C.C. § 4-A-204(1). However, banks and their customers can agree upon specific security procedures for verifying Payment Orders that the banks receive. U.C.C. § 4-A-201. And if banks can prove that these procedures are commercially reasonable, were followed, and that Payment Orders were accepted in good faith, the UCC provides that the banks need not reimburse customers, even for unauthorized Payment Orders. U.C.C. § 4-A-203.

105.    Whether particular security procedures are commercially reasonable is determined by a variety of factors, including the circumstances of the customer known to the bank, such as the size, type, and frequency of Payment Orders normally issued by the customer to the

bank.

106.    The U.C.C. specifies that use of an authorized signature specimen alone is not a sufficient security procedure. Consistent with this approach, legal and policy consensus is that comparable single-factor procedures, such as an online username and password, also are not a commercially reasonable security procedures standing alone. For example, the Federal Financial Institutions Examination Council ("FFIEC"), a federal interagency body that prescribes uniform procedures for U.S. financial institutions, has publicly cautioned that use of single-factor authentication is inadequate either to safeguard against scammers fraudulently infiltrating customers' online or mobile banking or to prevent widespread payment fraud.

107.    Multi-Factor Authentication ("MFA"), as opposed to single-factor authentication, is one available control for financial institutions to prevent fraudulent online or mobile activity. MFA requires more than one distinct authentication factor. The factors are something consumers know (such as usernames and passwords), something consumers have (such as mobile devices), and something consumers are (such as fingerprints or other biometric identifiers).

108.    MFA, however, has been shown to be ineffective when used alone. Consumers' email accounts, browsers, and mobile devices are common access points for scammers. Thus, the FFIEC recommends that financial institutions employ layered security approaches, which incorporates multiple preventative, detective, and corrective controls, and which is designed to compensate for potential weaknesses in any one control, including MFA.

109.    A critical aspect of layered security is an evaluation of consumers and their account histories, including usage patterns, the frequency of high-dollar transactions, and whether transactions or other recent online behaviors are anomalous. Nacha, the entity formerly known as

the National Automated Clearinghouse Association, which manages the ACH payment network, has commented that commercially reasonable, risk-based approaches to security will consider account characteristics and anomalous behavior. When banks identify anomalous behavior or transactions, commercially reasonable and effective controls will prompt the banks to employ more robust procedures to scrutinize and verify electronic payment activity.

110.    In addition to MFA, layered security can include a number of other effective controls, such as requiring dual authorization through different access devices, such as a phone call to a landline and a text message to a mobile device, limits on transaction frequency or size based on prior usage patterns, and the use of enhanced authentication techniques after changes to account types or characteristics, such as account upgrades or changes to passwords.

111.    Another aspect of effective layered security is sufficient training and controls for call center and fraud prevention employees. Scammers use engineering and other sophisticated techniques to deceive these employees into resetting passwords or granting scammers access to accounts, including online or mobile banking. Commercially reasonable security procedures are those that employ monitoring and processes to defeat fraudulent transactions in real time.

112.    Plaintiff further alleges that Citibank has repeatedly and deceptively induced Hiteks to enter into agreement for banking services with Citibank setting forth inadequate security procedures, misleading Hiteks about its rights, depriving Hiteks of statutory safeguards, falsely promising Hiteks that its money is secure when it is not, tricking Hiteks into executing unnecessary affidavits, inflating the likelihood of recovery of stolen funds, and blaming Hiteks without reason or justification.

**C.    Citibank Has Engaged in False Advertising and Deceptive Business Practices**

113.    As detailed in this Complaint, Defendant Citibank has engaged in false advertising and deceptive business practices.

114.    Citibank advertises to prospective business account clients that it provides "Security & Fraud Protection." Citibank further advertises: "Business Banking Made Easy." Even more, Citibank advertises that its security and fraud protection measures "Protect your business against losses from unauthorized activities in your Citibank accounts." *See* "Bank Accounts for Your Business," citi.com (accessed October 17, 2024).

115.    Defendant Citibank further advertises: "Citi Protects You." Via Defendant Citibank's "Security Center," Defendant Citibank advertises that "From fraud to identity theft, our comprehensive suite of advanced security features and services help keep you protected."

116.    With respect to fraud detection and warning alerts, Defendant Citibank further advertises: "Accounts routinely monitored to detect fraud or unauthorized use." Moreover, within this realm, Defendant Citibank advertises that it "will flag suspicious activity" and contact customers when suspicious activity occurs.

117.    The aforementioned advertising and marketing statements of Defendant Citibank are false and/or misleading, because in fact Citibank does not provide commercially reasonable security and fraud detection measures for its banking customers.

118.    Defendant Citibank also has engaged in deceptive business practices, in that it entices New York residents to open bank accounts by promising that it maintains commercially reasonable security and fraud detection measures.

119.    Specifically, Defendant Citibank knowingly does not use commercially reasonable means to safeguard customer bank accounts, prevent unlawful access to customer bank accounts,

detect fraud on customer bank accounts, process wire transfers for customer bank accounts, and contact customers in instances of suspected fraud on their bank account. These actions

120.    Citibank also knowing, deliberately, and/or intentionally withheld these facts in an attempt to persuade Hiteks, and other customers, to agree that Citibank's practices were commercially reasonable. This too constitutes a deceptive business practice.

121.    The Plaintiff specifically relied on Citibank's marketing and advertising claims when it decided to open an account with Citibank.

122.    In particular, since Plaintiff frequently utilizes wire transfers, and often conducts business internationally, Plaintiff sought out a banking relationship with a financial institution that, it thought, maintained adequate security measures, as advertised.

123.    Citibank's deceptive advertising and business practices induced Plaintiff into entering a banking relationship with Citibank.

124.    Plaintiff reasonably relied on Citibank's representations regarding its security measures, to his detriment.

125.    Citibank engaged in materially misleading conduct when it represented to customers and potential customers, including but not limited to Plaintiff Hiteks, that it maintained adequate security policies and protocols to protect the bank accounts of its customers.

126.    Citibank's marketing and advertising claims regarding its security practices were objectively misleading and were likely to mislead a reasonable consumer acting reasonably under the circumstances.

127.    Hiteks specifically read Citibank's advertising claims regarding its security protocols, and relied on the representations made by Citibank regarding its security protocols when it decided to open an account with Citibank.

128.    A reasonable consumer would be misled by Citibank's marketing and advertising claims regarding its security protocols. Indeed, security is one of the most essential features that a potential customer is looking for when they seek a banking relationship.

129.    Citibank's marketing and advertising statements can be proven true or false. Specifically, an independent evaluation by security experts can determine whether Citibank maintained appropriate security measures.

130.    Citibank engaged in materially misleading conduct when it represented to customers and potential customers, including but not limited to Plaintiff Hiteks, that it maintained adequate security policies and protocols to protect the bank accounts of its customers.

131.    Taken together, Citibank engaged in consumer-oriented conduct that is materially misleading, and Hiteks suffered an injury as a result of Citibank's deceptive acts and practices.

**D.    Defendant's Wrongful and Illegal Conduct has Damaged Hiteks**

132.    Defendant's wrongful, illegal, grossly negligent, and reckless conduct has damaged Hiteks.

133.    Prior to the below signed counsel's involvement, Citibank has refused to credit the fraudulent transfer amount, $149,994.89, back to Hiteks's account, as the company repeatedly and consistently promised it would do.

134.    This was despite the fact that Hiteks repeatedly informed Citibank that the company, as a small business, desperately needed the money for payroll and other business expenses.

135.    Due to Defendants wrongful, illegal, grossly negligent, and reckless conduct, as of the date the Complaint was filed, Hiteks has been damaged an amount exceeding $200,000, plus interest dating back to the dates of the unauthorized transfers in November 2023.

136.    Since Citibank refused to credit the money for nearly one year, despite its repeated statements that it would, it was necessary for Hiteks to obtain a short-term loan to cover its payroll and business expenses. This cost Hiteks another $59,700 as a result of the fraud.. *See* Exhibit E.

137.    The amount of $59,700 is further damage that Hiteks has suffered due to Defendants' wrongful, illegal, grossly negligent, and reckless conduct.

138.    Hiteks has suffered further damage due to the interference with its business activities and the need to retain counsel to remedy the harms caused by Defendant in this matter.

139.    Hiteks brings this Amended Complaint against Defendant for violations of the U.C.C., conversion, fraud, and for violations of New York General Business Law Sections 349 and 350.

140.    Defendants purposefully, deliberately, intentionally, and/or knowingly misrepresented and/or admitted material facts as to the adequacy and commercially reasonableness of its security practices for wire transfers.

141.    For example, Defendants knew, were on imputed and/or had actual notice that failure to use two factor authentication was a de facto commercially unreasonable security procedure, but hid this fact from account holders such as Hiteks.

**E.    Defendant's "Canned" Denial & Proforma Investigation**

142.    Citibank did not conduct an investigation in good faith when Hiteks reported the fraudulent wire transfers.

143.    Citibank back-dated a letter to Hiteks wherein it concluded that the bank was in no way responsible for the three fraudulent wire transfers. *See* Exhibit D.

144.    Specifically, in response to Hiteks' report of the unauthorized wires, Plaintiff was required to visit his local brank, to complete forms.

145.    These forms included having to complete an affidavit regarding the unauthorized wire transfers, wherein Hiteks' was requested to include specific details of how Hitkek's believed its systems were compromised and used to essentially defraud Citibank.

146.    While Citibank assured Hiteks that it would conduct an investigation and would reimburse Hiteks for the losses, upon information and belief, Citibank did not conduct any actual investigation of its own lapses, but rather focused on generating a proforma reason for denial of any responsibility or complicity in the fraud.

147.    Upon information and belief, Citibank's investigation was not an investigation of how its systems failed, but rather, at best, was ineffective, pro forma, and not reasonably tailored to mitigate the security failures that led to the unauthorized wires.

148.    Upon information and belief, Citibank's investigators do not speak to Hiteks, or its attorneys or agents, before simply putting a backdated form denial letter in the file that did not describe the scope of the investigation, what actions Citibank took, or what evidence Citibank relied upon. *See* Exhibit D hereto.

149.    Rather, Citibank's form letter merely asserted, in a conclusory fashion, what appears to be predetermined grounds for denying claims. *Id*.

150.    In fact, adding insult to Hiteks' injury, Citibank refused to respond to Hiteks' attorney's letters and inquiries, and ironically required two factor authentication, via letters of representation from the attorneys and separate letters of authorization from Hiteks, as a condition precedent to discussing the wires transfers with Hitek's own counsel.

151.    And Citibank still refused to discuss the matter even after such authorization, Citibank "security".

152. The punchline – Citibank required far greater authentication to prove the attorneys were authorized than Citibank did from the fraudsters to prove the wires were authorized.

153. Based upon information and belief, including filings in the prosecution ongoing by the New York State Attorney General's Office, this was not an isolated incident, but rather was typical of Citbank's response to customer reports of fraudulent wire transfers; Citibank did not conduct an investigation in good faith.

154. Instead of an investigation, at all times, Citibank has covered up its complicity and/or culpability in the fraudulent wire transfers by failing to conduct adequate or timely investigations of reported fraud and engaging in questionable tactics to shift blame onto the account holders, such as the Plaintiff here, by claiming, among other things, that contemporaneous multi-factor authentication was employed and that the related security codes provided by Citibank in good faith were intercepted as a result of the account holders negligence, when, in fact, no such contemporaneous codes were so sent by Citibank.

155. For example, Citibank has maintained, in sum and substance, at all relevant times hereto, that its investigations show:

(a) Plaintiff gave the scammers some account information,

(b) In addition to user name and password, account access was authenticated using multi-factor authentication, and confirmed with your client's cell phone ending in *1507, and

(c) At some point, the fraudsters either obtained remote access to the device, SIM-swapped the phone, or set it to call forwarding so that the scammers received critical codes and approvals, rather than your client.

156.    However, there are no records of Citibank contemporaneously authenticating the 11/6/23, 11/7/23 or 11/8/23 wires "using multi-factor authentication, and confirmed with your client's cell phone ending in *1507" via a text message or auto-dialed voice call providing a security code to enter at the time the wire transfer request wires were processed.

157.    To the contrary, the Plaintiff's cellular service provider records show the opposite to be true, i.e. that there was (1) uninterrupted service for the period in question, as well as (2) no contemporaneous use of two-factor authentication via text message or auto dialed calls to x1507 at the time Citibank executed the 11/6, 11/7, or 11/8 wire transfers.

158.    Citibank knew, or should have known, that its banking systems contained substantial security gaps that put customer bank accounts at grave risk for exploitation by hackers.

159.    Hiteks's telephone records reveal that the fraudsters contacted Hiteks from a 1-800 number that is registered as a Citibank customer service number.

160.    This strongly suggests that the fraudsters either were internal Citibank employees, or Citibank agents that had access to use the Citibank customer service number, or that fraudsters were able to hack Citibank's telecommunications system to make phone calls that appeared to Citibank customers as coming directly from Citibank.

161.    This also supports the conclusion that the fraudsters had access to Hiteks' private banking information available internally to Citibank employees and Citibank agents.

## **FIRST CAUSE OF ACTION**

**Violations of the U.C.C.**

**Against Defendant Citibank**

162.    Plaintiff repeats and realleges each of the foregoing allegations as if fully and completely set forth herein.

163.    The U.C.C. generally provides that banks must reimburse customers for unauthorized Payment Orders. U.C.C. § 4-A-204(1).

164.    Under Article 4-A of the U.C.C., Citibank cannot refuse to refund payments for unauthorized Payment Orders unless Citibank accepted the Payment Orders in good faith and in compliance with commercially reasonable security procedures and any instructions of its customers restricting acceptance of payment orders. U.C.C. § 4-A-202(2).

165.    Citibank has the burden of establishing that it is more probable than not that it acted in good faith and in compliance with the security procedures. U.C.C. § 4-A-105(g).

166.    Under Article 4-A of the U.C.C., if Citibank determines that its customers' funds were stolen in connection with unauthorized Payment Orders that were not enforceable, Citibank "shall refund any payment . . . and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund." U.C.C. § 4-A-204(1).

167.    Citibank has failed to employ commercially reasonable security procedures in connection with its handling of Payment Orders sent electronically via wire transfer requests in the following respects:

a.    Citibank's online terms and conditions have incorporated single-factor authentication protocols to verify Payment Orders sent electronically instead of layered security, including MFA, algorithmic monitoring of consumer and account behavior, mechanisms to identify high-risk transactions or anomalous behavior that trigger strengthened procedures, transaction limitations based on frequency, volume, and repeat activity, and training to ensure effective real-time responses to potential fraud, all of which are the hallmarks of commercially

reasonable security procedures;

b.      Citibank has failed to materially alter and employ its most robust verification procedures and protocols in response to anomalous activity that should have indicated suspicious or fraudulent activity, including Payment Orders that: (i) were received within hours of changes to consumers' electronic banking passwords; (ii) were received within hours of changes in consumers' online account type or status; (iii) were received within hours of consumers first enrolling in online wire transfer services; (iv) would have, if accepted and Citibank executed wire transfers from consumers' accounts in the same amounts, resulted in a near-zero balances in consumers' bank accounts; (v) were received following intra-bank transfers from consumers' other bank accounts that left near-zero balances in those other bank accounts; (vi) were the first or one of the first ever sent by consumers after several years of account activity; and (vii) were received within hours of similar Payment Orders that had been cancelled or were unable to be verified; and

c.      Citibank has not had sufficient controls and has not trained employees to respond effectively in real-time to reject fraudulent Payment Orders in response to consumers' timely instructions to limit such activity. Specifically: (i) notices of fraudulent activity to Citibank's customer service representatives have not secured consumers' bank accounts such that scammers could no longer successfully execute fraudulent Payment Orders; (ii) long hold times on phone communications after consumers' notices of fraudulent activity have slowed consumers' efforts to secure accounts; (iii) notices of fraudulent activity via telephonic dial or email have not secured consumers' bank accounts such that scammers could no longer successfully execute fraudulent Payment Orders; and (iv) requirements to travel to local branches to secure accounts have left consumers' bank accounts vulnerable to scammers' fraudulent

activity.

168.    Citibank has not acted in good faith or in compliance with its customers instructions in connection with its handling of Payment Orders sent electronically via wire transfer requests in the following respects:

      a.    Citibank has accepted Payment Orders in the face of one or more of the red flags identified in the preceding paragraph, all of which are common indicators of potentially fraudulent activity that should trigger robust verification protocols;

      b.    Citibank has accepted Payment Orders after consumers had provided notice that those Payment Orders were unauthorized and the result of fraudulent activity; and

      c.    Citibank has substantially delayed contacting beneficiary banks to freeze or recall consumers' stolen funds after notice of fraudulent activity.

169.    In addition, Citibank's standard-form denial letter, which appended no evidence, have described no findings, and have followed wholly inadequate investigations that often have not included basic interviews with affected consumers, have not satisfied Citibank's burden to prove that it was more probable than not that it (i) acted in compliance with security procedures, (ii) acted in good faith, or (iii) adhered to consumers' instructions regarding Payment Orders.

170.    Citibank's conduct constitutes gross negligence and/or reckless conduct.

171.    As a consequence of Defendants' breaches of the U.C.C., Plaintiff is entitled to compensatory damages in an amount to be determined at trial, but in no event less than the amount of the fraudulent transfers, plus interest paid on a short-term loan that Plaintiff was forced into obtaining due to Citibank's failure to timely refund the money.

172.    Defendants' breaches of the U.C.C. have caused, and continue to cause, Plaintiff economic damage and other direct and consequential damages and losses.

173.    Punitive and exemplary damages are necessary in this case to deter Defendant Citibank and other national banks from wantonly and maliciously failing to implement commercially reasonable security measures and failure to refund fraudulent monies in a timely manner.

## SECOND CAUSE OF ACTION

### Conversion

### Against Defendant Citibank

174.    Plaintiff repeats and realleges each of the foregoing allegations as if fully and completely set forth herein.

175.    Plaintiff was in lawful possession of $149,994.89 in its Citibank bank account. Plaintiff solely had the right to possess and control this money.

176.    Defendant Citibank interfered with Plaintiff's money in a manner that infringed on Plaintiff's rights because Citibank processed three fraudulent wires that, had Citibank employed reasonable security measures, it would have caught prior to the wire transfers. Citibank's conduct directly caused Plaintiff to lose this money.

177.    Lewis actually assumed control over a part of Plaintiff's money—specifically, $49,995.00, which was deposited into Lewis's bank account held and operated by Wells Fargo. Plaintiff solely had the right to control and possess this money, and thereby Citibank permitted Lewis to interfere with Plaintiff's property in a manner that infringed on Plaintiff's rights.

178.    Mendez actually assumed control over a part of Plaintiff's money—specifically, $50,000.00, which was deposited into Mendez's bank account held and operated by TD Bank. Plaintiff solely had the right to control and possess this money, and thereby Citibank permitted Mendez to interfere with Plaintiff's property in a manner that infringed on Plaintiff's rights.

179.    Fundora actually assumed control over a part of Plaintiff's money—specifically, $49,999.89, which was deposited into Fundora's bank account held and operated by Wells Fargo. Plaintiff solely had the right to control and possess this money, and thereby Citibank permitted Fundora to interfere with Plaintiff's property in a manner that infringed on Plaintiff's rights.

## THIRD CAUSE OF ACTION

### Fraud

### Against Defendant Citibank

180.    Plaintiff repeats and realleges each of the foregoing allegations as if fully and completely set forth herein.

181.    Defendant Citibank made a material misrepresentation of fact when it advertised repeatedly to Plaintiff, and other consumers, that it employs reasonable security measures for its bank accounts.

182.    Defendant Citibank knew of the falsity of this misrepresentation, because the company knew that more robust security measures were available and Defendant Citibank selected to utilize weak security measures that were unreasonable in light of commercial best practices.

183.    Defendant Citibank made the false misrepresentation with the intent to induce Plaintiff, and other customers, to open bank accounts with Defendant Citibank.

184.    Plaintiff justifiably relied on Citibank's misrepresentations, given Citibank's stature in the banking industry as one of the largest banks in the nation. Plaintiff further justifiably relied on Citibank's misrepresentations that the company employs reasonable security measures to stop fraudulent wire transfers.

185.    Citibank's conduct constitutes gross negligence and/or reckless conduct.

186.    Plaintiff suffered damages as a result of its reliance on Citibank's misrepresentations, and Plaintiff opened an account with Citibank, utilized the account for its business, and lost $149,994.89 due to Citibank's processing of three fraudulent wire transfers that, had Citibank employed reasonable security measures as it represented to Plaintiff, would not have occurred.

## FOURTH CAUSE OF ACTION

### Violation of New York General Business Law Section 349

### Against Defendant Citibank

187.    Plaintiff repeats and realleges each of the foregoing allegations as if fully and completely set forth herein.

188.    The Defendants' actions were materially misleading, the actions were consumer-oriented and Hiteks was injured as a result.

189.    Citibank's conduct constitutes gross negligence and/or reckless conduct.

190.    New York General Business Law Section 349 declares unlawful, *inter alia*, "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in" New York.

191.    By engaging in the deceptive acts and practices alleged herein, Defendant Citibank has engaged in deceptive and misleading practices in violation of New York General Business Law Section 349.

## FIFTH CAUSE OF ACTION

### Violation of New York General Business Law Section 350

### Against Defendant Citibank

192.    Plaintiff repeats and realleges each of the foregoing allegations as if fully and completely set forth herein.

193.    New York General Business Law Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in" New York.

194.    New York General Business Law Section 350-a further provides that "false advertising" is advertising that is "misleading in a material respect."

195.    By engaging in the advertising alleged above, Defendant Citibank has engaged in false advertising in violation of New York General Business Law Section 350.

## SIXTH CAUSE OF ACTION

### Commercial Bad Faith

### Against Defendant Citibank

196.    Plaintiff repeats and realleges each of the foregoing allegations as if fully and completely set forth herein.

197.    Defendant Citibank had actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in the fraudulent scheme to send unauthorized wire transfers from Plaintiff Hiteks' account.

198.    Citibank's scheme of wrongdoing amounts to bad faith or complicity by bank principals in confederation with the wrongdoers to defraud Hiteks of money via fraudulent wire transfers.

## SEVENTH CAUSE OF ACTION

### Breach of Contract

### Against Defendant Citibank

199.    Plaintiff repeats and realleges each of the foregoing allegations as if fully and completely set forth herein.

200.    Plaintiff entered into a contract with Citibank for a banking account and related services.

201.    Plaintiff performed its duties pursuant to the contract.

202.    Citibank breached its duties with respect to the contract.

203.    Plaintiff suffered damages as a result of Citibank's breach of contract.

### EIGHT CAUSE OF ACTION

**Negligence/ Gross Negligence**

**Against Defendant Citibank**

204.    Plaintiff repeats and realleges each of the foregoing allegations as if fully and completely set forth herein.

205.    Citibank was a fiduciary relationship with its clients, including Plaintiff.

206.    Citibank owed its clients, including Plaintiff,  a duty to safeguard client funds from this wire fraud that occurred here.

207.    Citibank breached its duty to Plaintiff, and was grossly negligent in discharging this duty.

208.    Absent Citibank's gross negligence in discharging this duty, including but not limited to its failure to use multifactor authentication via security codes prior to sending each wire at issue here, was a direct and a proximate cause of Plaintiff's damages.


### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Hiteks respectfully requests the following relief:

(1) Judgment against Defendant awarding compensatory, consequential, special, exemplary, and punitive damages in an amount to be determined at trial;

(2) Statutory damages and relief, as may be applicable;

(3) An award of plaintiff's attorneys' fees, costs, and disbursements accrued in pursuit of this action, and/or any other applicable statute; and

(4) Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all causes of action asserted within this pleading.

Dated: Cherry Hill, NJ
February 27, 2025

DEBENEDICTIS & DEBENEDICTIS LLC

By:    /s/ Michael DeBenedictis
Michael J. DeBenedictis, Esq.
1415 Route 70 East. Suite 103
Cherry Hill, New Jersey  08034
Tel: (856) 795-2101

AND

SALZANO ETTINGER & LAMPERT LLP
Efthimios Parasides, Esq.
Frank Salzano, Esq.
Jason Lampert, Esq.
104 West 40th Street, 14th Floor
New York, New York  10018
Tel: (212) 375-6746

*Attorneys for Plaintiff*